# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| EVA and HAROLD BARON, Individually and on Behalf of All Others Similarly Situated, | ) Cause No. 1:13-cv-2032-WTL-TAB |
| | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANGIE'S LIST, INC., WILLIAM S. OESTERLE, CHARLES HUNDT, MARK HOWELL, ROBERT R. MILLARD, and ANGELA R. HICKS BOWMAN, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ........................................................................................ 1

II. JURISDICTION AND VENUE .................................................................................. 7

III. PARTIES ..................................................................................................................... 8

    A. Lead Plaintiff ................................................................................................... 8

    B. Defendants ....................................................................................................... 9

IV. OVERVIEW .............................................................................................................. 11

    A. Angie's List Promoted The PMM As The Company's Defining Characteristic .. 11

    B. Defendants Trumpeted The "Predictable Revenue Streams" That The PMM Purportedly Delivered ................................................................................... 14

    C. Defendants Misled Investors Concerning The Stability Of The PMM In The Company's Oldest and Most Established Cohorts And The Company's Prospects ......................................................................................................................... 17

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT .............................................................. 20

VI. THE TRUTH CONCERNING THE COMPANY'S PMM, ITS CORRESPONDING REVENUE STREAMS, AND THE STABILITY OF THE COMPANY'S BUSINESS GRADUALLY EMERGES .............................................................................................. 27

VII. DEFENDANTS' SCIENTER ................................................................................... 33

VIII. LOSS CAUSATION .................................................................................................. 37

IX. LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE .......................................................................................................... 42

X. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE .............................................................................................. 43

XI. CLASS ACTION ALLEGATIONS ......................................................................... 44

XII. CAUSES OF ACTION .............................................................................................. 47

XIII. PRAYER FOR RELIEF ........................................................................................... 53

Lead Plaintiff, United Food & Commercial Workers Local 464A – Pension Fund ("Lead Plaintiff"), makes the following allegations on its own behalf and on behalf of the Class (as defined herein) against defendants Angie's List, Inc. ("Angie's List" or the "Company"), William S. Oesterle ("Oesterle"), Charles Hundt ("Hundt"), Mark Howell ("Howell"), Robert R. Millard ("Millard"), and Angela R. Hicks Bowman ("Hicks Bowman") (collectively, "Defendants").  The allegations in this Complaint are based upon personal knowledge as to Lead Plaintiff and its own acts, and are based upon information and belief as to all other matters alleged herein.  Lead Plaintiff's information and belief is based upon a continuing investigation, conducted by Lead Plaintiff's counsel under Lead Plaintiff's supervision, into the facts and circumstances alleged herein including, without limitation, review and analysis of:  (i) Angie's List's filings with the United States Securities and Exchange Commission ("SEC"); (ii) securities analysts' reports concerning Angie's List; (iii) Angie's List's press conferences, investor and analyst conference calls, and corresponding transcripts thereof; (iv) Angie's List's press releases and other public statements; (v) media reports and other publications concerning Angie's List and/or the other Defendants named herein; (vi) interviews of former Angie's List employees; and (vii) Angie's List's corporate website.  Lead Plaintiff believes that additional evidentiary support for the allegations herein will likely emerge after a reasonable opportunity to conduct discovery.

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") on behalf of all persons who purchased or otherwise acquired Angie's List common stock during the period from February 13, 2013 through October 23, 2013 (the "Class Period"), and were damaged thereby (the "Class").

2.      Angie's List operates a subscription-based website for consumers to research, hire, rate, and review local service providers that furnish "high cost of failure" services, such as plumbing, roofing, and electrical repair.  Angie's List also offers putatively highly-rated local service providers a platform to advertise and offer discounts and other promotions to the Company's subscribed members.  The Company's common stock trades on the NASDAQ under the symbol "ANGI."

3.      The Company utilizes a "paid membership model" (the "PMM"), pursuant to which Angie's List requires its members to pay subscription fees in order to access the content of the Company's website and to utilize the services offered therein.  Members are then permitted to rate and review the service providers whom they have hired on a scale of "A" to "F" in several different categories of performance.  Angie's List also purports to help resolve any disputes that may arise between the Company's members and participating service providers.

4.      Angie's List boasts that its PMM sets the Company apart from other internet-based platforms on which consumers review service providers who pay to advertise, such as Yelp!, Google Reviews, and Thumbtack.  In this regard, the Company claimed during the Class Period that its PMM ensured that Angie's List members were "affluent, educated, and busy" consumers who "self select in with a bias toward action and purchase."  According to Angie's List, the demographics of its membership base provided:  (i) motivated and engaged consumers who would furnish meaningful and high-quality data, thus protecting the reliability of the ratings and reviews received from those members; and (ii) a superior advertising platform for predominantly local service providers, who would be attracted to and pay more for the "highly qualified leads" that Angie's List claimed to provide.  For these reasons, and the others alleged herein, the Company consistently claimed that the membership base that the PMM provided was

critical to the Company's "ability to grow [its] business" and was, therefore, its most valuable asset.

5.      Pursuant to its PMM, when the Company enters a new geographic market (typically consisting of a metropolitan area), it often offers complimentary memberships to lay the foundation for a planned transition of the cost of monthly, annual, or multi-year membership to paid introductory rates and then to more significant paid membership rates.   The PMM transition period for a new market generally lasts for twenty-four (24) months, according to the Company's SEC filings.   The Company aggregates its existing PMM markets into "cohorts" categorized by the time period in which their constituent markets transitioned to paid membership status.

6.      During the Class Period, the Company represented that its oldest and largest cohorts had already transitioned to significant subscription fees.   Furthermore, the Company regularly directed investors to the "operating characteristics of [its] oldest cohorts" as the primary indicators of the Company's financial stability and to demonstrate "the potential for the entire business." ***According to the Company, the oldest cohorts represented the "pathway for all subsequent cohorts to follow***."[1]   This action concerns Defendants' material misrepresentations and omissions of material fact concerning the PMM in Angie's List's oldest and most established cohorts – the very nerve center of the Company's business.

7.       By pitching the value of the PMM to service providers, the Company also generates revenue through advertising contracts with eligible service providers.   According to the Company, only service providers who have received an average grade of "B" or better on an "A" to "F" scale, and have received at least two reviews in the last three years, qualify to place paid

---

[1] All emphasis herein is added unless otherwise noted.

advertisements on Angie's List.  The Company reports that service provider revenue renews at over 100% each year.

8.      With the two revenue streams that the PMM provides – membership subscription fees and service provider advertising payments – serving as the self-described backbone of the Company's financial stability, the Company claimed during the Class Period that it was positioned for growth.  According to Defendants, the PMM provided a "flywheel."  That is, the Company represented that the PMM enabled Angie's List to:  (i) continue to grow its paid membership base by acquiring more paying subscribers; which (ii) enabled the Company to offer eligible local service providers a larger pool of putatively high-quality customer leads. The viability and predictability of the Company's service provider revenue stream – and its ability to sustain the revenue stream through higher initial and renewal advertising rates charged to service providers – is almost entirely dependent upon the Company's ability to maintain and foster a membership base of individuals who move beyond complimentary and introductory membership subscription rates and are willing (and in fact do) pay more substantial subscription fees.   Indeed, according to the Company, permanently free and/or low-cost memberships significantly diminish the quality of a lead and therefore the Company's ability to continually increase service providers' advertising fees on an annual basis:  ***"[t]he importance of being an Angie's List service provider is because of the quality of the members and the bias of the members toward action*** and also the transparency of those members and also the integrity and value of the data."

9.      Throughout the Class Period, Defendants made repeated representations regarding the stability and "predictability" of the two core revenue streams that the PMM provided and the Company's present success and long-term sustainability based upon those streams.  However,

Defendants' Class Period statements regarding these topics were materially false and misleading when made because Defendants knowingly or recklessly misrepresented and/or failed to disclose that in order to remain competitive with the growing number of free services offered within the same markets where the Company operated, *Angie's List was slashing membership prices charged to new members in existing markets – including in the Company's "oldest cohorts" and most well-established markets: Indianapolis, New York, Chicago, San Francisco, and Washington, D.C.* As alleged herein, these undisclosed membership price cuts: (i) jeopardized the current state of the Company's membership revenue; (ii) impaired Angie's List's ability to increase membership revenue in the future; and (iii) directly diluted the so-called "highly qualified leads" that Defendants claimed drove the Company's advertising revenues – rendering Defendants' Class Period statements concerning the PMM materially false and misleading. Specifically, Defendants were not continuing to increase membership rates in mature markets pursuant to their stated policy of rate transitioning. Instead, Angie's List was implementing a plan to permit new members in the Company's most mature markets to effectively lock into introductory rates on a permanent basis.

10.    Based upon the Company's "flywheel" concept, the undisclosed new member price cuts in Angie's List's most established markets not only compromised the predictability of the Company's revenue stream derived from member subscription fees, but also undermined the PMM's ability to offer service providers a "qualified" and "engaged" pool of potential customers – the very asset that the Company routinely represented as the critical feature differentiating Angie's List from its competitors.

11.    Just before the close of trading on October 2, 2013, investors learned that Angie's List had slashed prices in its two "oldest cohorts" and most established markets, dealing a direct

blow to the purported reliability and predictability of the Company's membership and service provider revenue streams.  Specifically, *The Wall Street Journal* revealed that ***Angie's List had drastically slashed subscription fees in many of its oldest and most mature key markets (Indianapolis, New York, Chicago, San Francisco, and Washington, D.C.) by approximately 75% – effectively reverting to the same introductory rates that the Company portrayed during the Class Period as a thing of the past in those markets.***  In direct response to the news of these secret membership subscription rate cuts, the price of Angie's List's common stock declined by $3.68 per share, or ***more than 17%***, from a close of $20.99 per share on October 2, 2013, to a close of $17.31 per share on October 3, 2013, on heavier than usual trading volume of more than 12.8 million shares – then, the largest single day trading volume since the Company's November 17, 2011 initial public offering ("IPO").

12.     Analysts covering the Company reported that the undisclosed membership rate slashing was inconsistent with the Company's previous representations, which "***generally pointed to rising prices in newer markets - towards the pricing in older markets – as the path we should expect, not price cuts across all markets***," and that such cuts prompted "***outrage from investors left in the dark***."  Indeed, Deutsche Bank deemed the "erratic pricing tests on the site . . . potentially symptomatic of other problems," and referred to the Company's "emphasis on the high value of its paying subscribers to its [service provider] advertising business" in concluding that "it's hard not to question whether a lower priced sub[scription] can drive the same value for the business as its oldest sub[scriptions]."

13.     Seeking to control the fallout from the *Wall Street Journal's* unanticipated disclosure of the dramatic new member subscription rate cuts in the Company's most established markets, Defendant Oesterle continued to mislead investors about the status of the PMM and the

6

Company's business prospects in an interview on October 14, 2013 with the Wall Street Transcript ("October 14 Interview"), during which he represented that the Company's "***base business is executing extremely well.***"

14.     Ultimately, after the close of trading on October 23, 2013, the Company confirmed market concerns regarding the putative stability and predictability of the revenue streams that the PMM provided when it issues a press release ("3Q 2013 Press Release") reporting its third-quarter 2013 ("3Q 2013) financial results and fourth-quarter 2013 ("4Q 2013") guidance, which missed analysts' expectations.  The Company's disappointing performance was directly at odds with the Company's repeated assurances during the Class Period that the "business was working well."   In truth, Angie's List had undermined its own PMM by dramatically reducing the significant membership fees charged in its most established markets – the very fees that Defendants uniformly represented as the defining characteristic of Angie's List, which enabled the Company to charge annually increasing advertising rates to service providers.

15.     Following the news on October 23, 2013, which confirmed that the Company's undisclosed membership price reductions had materially impacted the predictability of its membership and service provider revenue streams, Angie's List's shares declined by more than 5%, from a close of $15.45 per share on October 23, 2013 to close at $14.64 on October 24, 2012, on heavier than usual trading volume of more than 6.7 million shares, causing Lead Plaintiff and the Class to suffer further damages.

## II.    JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §

240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §

1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. § 1391(b), as the Company is headquartered and conducts substantial business in this

District, and many of the acts and practices complained of herein, including the

misrepresentations and omissions of material fact alleged herein, occurred in substantial part in

this District.

18.     In connection with the acts alleged herein, Defendants, directly or indirectly, used

the means and instrumentalities of interstate commerce, including, but not limited to, the United

States mail, interstate telephone communications, and the facilities of the NASDAQ, a national

securities market.

## III.     PARTIES

### A.     Lead Plaintiff

19.     Lead Plaintiff, United Food & Commercial Workers Local 464A – Pension Fund,

is a joint-labor-management-sponsored trust fund established for the purpose of providing

retirement benefits to members of the Local 464A United Food & Commercial Workers Union.

On behalf of its approximately 20,000 active and retired participants, Lead Plaintiff has

approximately $575 million in assets under management.   As reflected on its certification

previously filed in this action (ECF No. 39, Exs. B and C), Lead Plaintiff purchased shares of

Angie's List common stock on the NASDAQ during the Class Period at prices that were

artificially inflated by the materially false and misleading statements and omissions of material

fact complained of herein and was damaged thereby.

B.      **Defendants**

20.      Defendant Angie's List, a Delaware corporation headquartered in Indianapolis, Indiana, operates a subscription-based website that publishes customer reviews of local service providers and offers a target market of potential customers to local service providers across the United States.  The Company's common stock trades on the NASDAQ under the ticker symbol "ANGI."

21.      Defendant Oesterle, a co-founder of the Company, served as a member of the Company's Board of Directors ("Board") and as the Company's Chief Executive ("CEO") at all relevant times.  The Company's February 25, 2013 Form 10-K for the year ended December 31, 2012 ("2012 Form 10-K") describes Defendant Oesterle, along with Defendant Hicks Bowman, as "critical to [the Company's] overall management as well as the development of [the Company's] culture and strategic direction."  As alleged below, during the Class Period, Oesterle signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) February 13, 2013 press release announcing the Company's financial results for the fiscal year 2012 ("FY 2012") and three months ended December 31, 2012 ("4Q 2012") (together with FY 2012, "4Q/FY 2012") ("4Q/FY 2012 Press Release"); (ii) February 13, 2013 conference call ("February 13 Conference Call") regarding the 4Q/FY 2012 financial results; (iii) 2012 Form 10-K; (iv) April 24, 2013 press release announcing the Company's financial results for the three months ended March 31, 2013 ("1Q 2013") ("1Q 2013 Press Release"); (v) April 24, 2013 conference call ("April 24 Conference Call") regarding the 1Q 2013 financial results; (vi) April 25, 2013 interview with CNBC ("April 25 Interview"); (vii) Stifel Nicolaus Internet, Media & Telecom Conference held on May 21, 2013 ("May 21 Conference"); (viii) June 17, 2013 interview with Fox Business News ("June 17 Interview"); (ix) July 24, 2013 conference call

regarding the Company's financial results for the three months ended June 30, 2013 ("2Q 2013") ("July 24 Conference Call"); (x) September 4, 2013 interview with CNBC ("September 4 Interview"); (xi) Deutsche Bank's DbAccess Technology Conference held on September 12, 2013 ("September 12 Conference"); and (xii) the October 14 Interview.

22.     Defendant Howell served as the Company's Chief Operating Officer ("COO") from March 1, 2013 through the end of the Class Period.  During the Class Period, Howell made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) Canaccord Genuity Growth Conference held on August 15, 2013 ("August 15 Conference").

23.     Defendant Millard served as the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until his April 1, 2013 resignation, which the Company abruptly announced on March 14, 2013.  Defendant Millard remained an employee with the Company through June 28, 2013.  During the Class Period, Millard signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) 2012 Form 10-K; and (ii) Deutsche Bank's DbAccess 21st Annual Media and Telecom Conference held on March 5, 2013 ("March 5 Conference").

24.     Defendant Hundt served as the Company's Chief Accounting Officer (CAO") at all relevant times, and served as the Company's interim CFO from the time of Millard's April 1, 2013 resignation through August 21, 2013.  During the Class Period, Hundt signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) quarterly report on Form 10-Q for 1Q 2013 filed with the SEC on April 25, 2013 (the "1Q 2013 Form 10-Q"); (ii)

July 24 Conference; and (iii) quarterly report on Form 10-Q for 2Q 2013 filed with the SEC on July 25, 2013 (the "2Q 2013 Form 10-Q").

25.    Defendant Hicks Bowman, a co-founder of the Company, served as a member of the Company's Board since March 12, 2013 and as the Company's Chief Marketing Officer ("CMO") at all relevant times.   Like Defendant Oesterle, the 2012 Form 10-K describes Defendant Hicks Bowman as "critical to [the Company's] overall management as well as the development of [the Company's] culture and strategic direction."

26.    Defendants Oesterle, Howell, Millard, Hundt, and Hicks Bowman are referred to collectively herein as the "Individual Defendants."

## IV.    OVERVIEW

### A.    Angie's List Promoted The PMM As The Company's Defining Characteristic

27.    Founded privately in 1995 as Brownstone Publishing, LLC by Defendants Oesterle and Hicks Bowman, Angie's List is a Delaware corporation headquartered in Indianapolis, Indiana.   On November 17, 2011, Angie's List became a publicly-traded company through an IPO of 8.79 million shares of the Company's common stock priced at $13 per share.

28.    The Company is primarily a subscription-based website for consumers to research, hire, rate, and review service providers who furnish "high cost of failure" services, such as home remodeling, plumbing, roof repair, health care, and automobile repair, in local markets across the United States.   In addition, Angie's List purports to invite only "highly rated" local service providers to advertise on its website by offering discounts and other money-saving promotions to its members.

29.    Angie's List operates in a competitive landscape that includes many free online consumer review websites, such as Yelp!, Google Reviews, and Thumbtack, among others. Throughout the Class Period, Defendants regularly touted the Company's PMM as the critical

feature differentiating Angie's List from its competitors, stressing that the PMM "does tremendous things for [the Company]." Through the PMM, the Company claimed to offer: (i) consumers a "*trusted resource*" for researching and hiring local service providers based upon consumers' access to other paying members' ratings and non-anonymous reviews; and (ii) local service providers an efficient means to target a large base of "*highly qualified leads*" consisting of "*engaged*" *consumers who were "affluent, educated, and busy*."

30.     As set forth in the Company's 2012 Form 10-K, Angie's List's PMM allowed the Company to generate purportedly predictable revenue streams from each of its core components: (i) membership subscription fees; and (ii) advertising contracts with local service providers. During the Class Period, Defendants referred to the PMM and its corresponding symbiotic revenue streams as a "flywheel." For example, during the August 15 Conference, Defendant Howell stated: "the more members that you get through that first 30 months [the complementary and introductory rate period], the more service providers that sign up, the more service providers that sign up, it drives word-of-mouth with the membership and they feed on themselves." As to service provider revenue in particular, the Company purportedly permitted only service providers who have received an average grade of "B" or better on an "A" to "F" scale and at least two reviews in the last three years to advertise on its website.

31.     To maximize the two sources of revenue that the PMM generated, Angie's List's "key growth strategy" during the Class Period was to attempt to leverage and monetize its paid membership base through a network effect. In this regard, the Company sought to invest aggressively in national advertising in order to increase the number of its paid subscribers, which would expand the content of the Company's "reliable database" of ratings and reviews, attracting additional members. In turn, this broader base of "loyal and engaged" paid members would

supposedly increase advertising sales and command higher advertising rates from service providers.

32.     Indeed, as Defendant Oesterle explained on the April 24 Conference Call, the Company's professed ability to charge substantial membership fees to members after transitioning from complementary memberships enabled the Company to establish and leverage its motivated, high-quality membership base:  "We've invested years and years and millions and millions of dollars identifying very high-quality users and very high-quality service providers, and we have a relationship with them, *a paid one*, and we're leveraging that."  As he stated during the April 25 Interview, charging membership fees pursuant to the PMM created "a predictable business" where the Company, a self-proclaimed "honest broker of information on the web," was able to "offer[] a premium product."

33.     Similarly, at the May 21 Conference, Defendant Oesterle characterized Angie's List as the "premium provider in the marketplace" because, unlike its competitors, *"[w]e charge."*  As a result, "we have to provide very high quality data," which distinguishes Angie's List as "an honest brokerage model."  The free models, he stated, "are going to kill you." Describing the Company's current and prospective members, Defendant Oesterle stated, "[t]hese people are affluent.  They're dual income.  They're highly educated.  They're busy.  They have very high household incomes.  They're homeowners."  A few weeks later, during the June 17 Interview, Defendant Oesterle reiterated that the Company "ha[s] a paid membership" and "paying that [membership fee] ensures that [reviews] are high quality, it gives us information about who is giving them. . . ."

34.     At the August 15 Conference, Defendant Howell similarly stated that "*[o]ur value to both the member and the service provider [is] reaffirmed in a paid model*."  Howell further stated the following concerning Angie's List's PMM:

> *We are bringing highly qualified leads to our service providers and they recognize that.  The importance of being an Angie's List service provider is because of the quality of the members and the bias of the members towards action and also the transparency of those members and also the integrity and value of the data.  There are no anonymous reviews.  People have paid to provide the data and people have paid to use the data.*

35.     Defendant Howell also represented that the Company's ability to get members beyond the complimentary and/or introductory-rate stages was imperative to attracting service providers' paid advertisements:

> What I will tell you is it's very much of a flywheel concept because the more members that you get through that first 30 months, the more service providers that sign up, the more service providers that sign up, it drives word-of-mouth with the membership and they feed on themselves.

36.     Indeed, during the September 4 Interview, Defendant Oesterle represented that the PMM provided Angie's List with a "very predictable" core business:  "Wonderfully, it is all very predictable.  *It is all very measurable and consistent*."

37.     Later, at the September 12 Conference, Defendant Oesterle emphasized to investors that by continually transitioning new markets from complimentary memberships to more mature rates, "*you get an engaged user.  This is somebody who is ready, willing and able to consume the services, which makes them unbelievably valuable for the service companies . . . . Why?  Because they pay, they've self-identified, I'm a good user*."

## B.     Defendants Trumpeted The "Predictable Revenue Streams" That The PMM Purportedly Delivered

38.     Throughout the Class Period, Defendants issued numerous statements assuring investors that the Company's PMM had solidified "predictable stream[s] of revenue" through

each of its core components, describing the PMM as a "highly reliable, subscription, business model" that provided:  (i) substantial subscription fees from the paid membership base; and (ii) lucrative advertising contracts (and subsequent high-margin renewals of those contracts) from service providers.

39.     With respect to the subscription fees, Defendants highlighted for investors the importance of the Company's ability to transition from complimentary and "introductory" rates to more substantial membership rates in each of its cohorts, and represented that such a transition had been accomplished successfully in the Company's oldest and most mature cohorts, such as Indianapolis, New York, Chicago, San Francisco, and Washington, D.C.  According to the Company, the PMM included only a "'de minimis' number of free memberships . . . within the total number of paid memberships reported to the public and utilized to negotiate advertising contracts with service providers."

40.     Based upon the purported "value" that Angie's List's "engaged" and "highly qualified" members offered to service providers as a direct result of members' willingness to continue their memberships after the complimentary and/or introductory-rate subscriptions that the Company initially offered to them expired, Defendants made repeated assurances concerning the "predictability" of the Company's service provider revenue stream and the Company's ability to maintain and grow the core components of the PMM providing that revenue stream.

41.     Specifically, in the Company's 2012 Form 10-K, 1Q 2013 Form 10-Q, and 2Q 2013 Form 10-Q, Angie's List stated in pertinent part that the Company's "high service provider renewal rate as a percentage of initial contract value renewed, have provided us with a relatively predictable revenue stream."  Crucial to attracting and maintaining the service provider revenue

stream, of course, was the Company's ability to recruit and retain the putatively "highly qualified leads" that it claimed to provide through the PMM.

42. Indeed, during the March 5 Conference, Defendant Millard reaffirmed that the Company's "tremendous growth in [the] service provider, ad revenue side of the business. . . . really all begins with the member. . . . You have to have and acquire that member if you're going to monetize that member on the service provider side."

43. During the July 24 Conference, Defendant Hundt reiterated that the Company was "still seeing well over 100%" of service provider renewals. Analysts such as PiperJaffray again gave the Company positive ratings based upon their belief that "service providers are increasingly fueling the Angie's List flywheel, with dollar advertising renewals remaining well over 100% on a dollar basis."

44. During the August 15 Conference, Defendant Howell explained that the Company's ability to transition members beyond the introductory rates and "get [members] through that first 30 months," (after which the Company charged higher membership rates), was the catalyst for Angie's List's ability to continue to grow the paid membership base and "sign up" and continue to charge high-dollar advertising fees to service providers. In this regard, Defendant Howell claimed that "[p]enetration and renewal rates increase significantly over time as well on both the service provider and member side."

45. At the September 12 Conference, Defendant Oesterle continued to extol the virtues of the PMM, stating that "*[t]here's no question that growing the member base helps us with renewal pricing*." In response to an analyst's question as to whether the Company could "continue to maintain a high rate" on renewed contracts, which was a material component of the "predictable [service provider] revenue stream," Defendant Oesterle concluded, "[w]e intend to

16

keep growing the member base and if that's true, then *we kind of don't have to worry about it too much*."

C.  **Defendants Misled Investors Concerning The Stability Of The PMM In The Company's Oldest and Most Established Cohorts And The Company's Prospects**

46.    During the Class Period, Defendants falsely portrayed that the PMM's membership fees, and thus member engagement, were escalating.  In so doing, Defendants consistently pointed to the supposed success that Angie's List was enjoying in the Company's oldest and most established cohorts as the primary indicators of the Company's financial stability and as demonstrating "the potential for the entire business."  Defendants' material misstatements and omissions concerning the Company's oldest cohorts – the touted "pathway for all subsequent cohorts to follow" – also rendered materially false and misleading numerous statements that Defendants made during the Class Period attesting to the success and long-term sustainability of the Company's business and the PMM's demonstrated viability in its most mature markets.

47.    Indeed, on the first day of the Class Period, February 13, 2013, when Angie's List announced its 4Q/FY 2012 financial results, the Company reported the first profitable quarter in its history.  Defendants enthusiastically seized upon the Company's 4Q 2012 performance as evidence of the PMM's success and viability, particularly in Angie's List's most established markets.  For instance, in the Company's 4Q/FY 2012 Press Release, Defendant Oesterle stated that *"[t]he operating characteristics of our oldest cohort continue to demonstrate the potential for the entire business*."  That same day, during the Company's February 13 Conference Call, Defendant Oesterle boasted that "*the business is just working well*."  He also assured investors that "we have got kind of everything working.  Angie's got the marketing side working, and Mike Rutz has the service provider side working.  It is just, yes, we are getting good broad-based growth. Good originations, good renewals. . . ."

17

48.     After the Company reported its 4Q/FY 2012 results, analyst Canaccord Genuity issued a February 13, 2013 report based upon Defendants' positive statements, commenting in pertinent part that "[w]ith . . . *questions over viability of the model largely behind us*, we look for further evidence that service provider ARPU [Average Revenue Per User] can grow significantly and that mix-shift towards renewals can drive sustained margin expansion." Similarly, on February 14, 2013, Barrington Research stated:  "*[W]e believe in the [C]ompany's business model . . . . Angie's first cohort of territories demonstrates its ability to achieve newer-cohort profitability, in our view*."

49.     At the March 5 Conference, a Deutsche Bank analyst asked Defendant Millard the following question:  "[Y]our oldest cohorts in terms of markets has gotten pretty meaningful. Do you think that, that is a good guide for where you can get in the newer cohorts?  Is that your operating thought there?"  Defendant Millard responded "[v]ery much so."  He then reaffirmed that *"the oldest cohort provides a path for the other cohorts"* and that "Indianapolis [the Company's first market] also provides a path for all those other markets within that most mature cohort, so we believe we have a lot of room to grow and upside potential."

50.     On March 6, 2013, PiperJaffray also expressed confidence in the Company's PMM, stating in pertinent part:  "There are two main drivers in our confidence in Angie's List. First, is the ability of the [C]ompany to leverage its model and deliver positive EBITDA on a consistent basis. . . .  Secondly, in addition to a model that offers considerable leverage, we also anticipate the [C]ompany being able to deliver revenue growth of 30%+ through 2015."

51.     Similarly, on March 14, 2013, Janney Capital Markets reported in pertinent part, "[w]e believe ANGI is well positioned in the large ($400BN+) local services marketplace – connecting members and service providers driven by trusted reviews (Social Leads).  ANGI's

stepped-up national advertising campaign is driving accelerating membership growth and fueling the 'secret sauce' service provider advertising revenue – *building a powerful network effect*."

52.     Thereafter, during the April 24 Conference Call, Defendant Oesterle claimed the following about the PMM's putative success in the Company's oldest cohorts:

> And so Indianapolis and the mature markets represent this wonderful case where they are profitable. They're – they have very good contribution margins to the organization, and we've been increasing the marketing spend, so their growth rates are still high, and *that's what gets us the phenomena of sustainable growth and improving margin*. We've got that going on. *To some degree, the entire business is shifting into that mode now.*

53.     Likewise, during the July 24 Conference Call, Defendant Oesterle was asked to address the slight decline in the Company's overall revenue per member. In response, he again highlighted the putative success of the PMM in the Company's oldest cohorts, stating "*I think [it is] very positive news that we continue to grow the oldest cohorts at rapid rates*" and that "*there is all good news in the mature cohort*." PiperJaffray noted on July 24, 2013 that "membership growth in its oldest cohort" led them to believe "the fundamental story is progressing along."

54.     Yet contrary to Defendants' consistently positive representations set forth above and as further alleged below, Defendants knew or recklessly disregarded that the Company's oldest cohorts and more mature markets no longer provided a pathway for newer markets and that the PMM business was, in fact, *not* working well. Rather, the Company began slashing membership prices in the very markets – the oldest cohorts and most mature markets – that Defendants uniformly highlighted for investors as the benchmarks for the Company's success, stability, and growth potential. Namely, Angie's List dramatically reduced new member subscription fees by *as much as 75%* by offering memberships at near-complimentary introductory rates in established markets, such as Indianapolis, New York, Chicago, San Francisco, and Washington D.C., among others. Thus, unbeknownst to investors, the Company

was effectively abandoning the core value proposition of the Company's PMM, which:  (i) compromised the predictability of the revenue derived from its member subscription fees; and (ii) impaired the PMM's ability to offer service providers a "qualified" and "engaged" pool of potential customers – the very asset that the Company routinely touted as the critical feature in securing and maintaining advertising revenues and in differentiating itself from its competitors.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

55.     The Class Period begins on February 13, 2013.  On that date, Angie's List announced its 4Q/FY 2012 financial results.  4Q 2012 was the Company's first ever profitable quarter.  For the quarter, the Company reported in the 4Q/FY 2012 Press Release:  (i) increased revenues of $46.2 million, up 68% over the prior year quarter; (ii) service provider revenue of $32.5 million, up 83% over the prior year quarter; (iii) a 24% decline in marketing cost per paid membership acquisition ("CPA") to $39.00.  With respect to FY 2012, the Company announced: (i) revenues of $155.8 million, up 73% compared to fiscal year 2011; and (ii) total paid memberships of 1,787,394, up 66% from the prior year.

56.     In the 4Q/FY 2012 Press Release, Defendants highlighted the Company's results in its oldest markets as substantially contributing to the Company's 4Q 2012 performance and as putative evidence of the stability and viability of the Company's PMM.  In this regard, Defendant Oesterle stated in the Company's 4Q/FY 2012 Press Release that "*the operating characteristics of our oldest cohort continue to demonstrate the potential for the entire business*."  During the February 13 Conference Call, Defendant Oesterle similarly claimed that "*the business is just working well*."

57.     On February 25, 2013, Angie's List filed its 2012 Form 10-K, which was signed by Defendants Oesterle and Millard.  In the 2012 Form 10-K, Defendants made the following

representations about the "predictable revenue stream" that the Company's PMM generated from

membership subscription fees:

a) "*[S]ubscription fees [from members] represent a significant source of working capital and provide a relatively predictable revenue stream*."

b) "The pre-2003 cohort includes our ten most established markets, where we initially built out our business model.  The markets in this cohort include several mid-sized urban markets in the midwest as well as Chicago and Boston.  The 2003 through 2007 cohort includes the first major subset of markets, including many of our largest potential markets, that we targeted in our national expansion strategy.  *The markets in these older cohorts have begun to achieve penetration rates that allow us to transition beyond introductory membership and advertising rates*."

c) "Total paid memberships in each cohort *includes a de minimis number of complimentary memberships* in our paid markets for the period presented."

d) "Increasing new paid memberships is [the Company's] key growth strategy."

e) "[H]igh membership renewal rates and word of mouth referrals from existing members . . . *would enable [the Company] to maintain and potentially grow the size of our paid membership base at a lower level of overall advertising spending*."

58.    During the May 21 Conference, in response to questions concerning the

Company's success in certain markets within its oldest cohorts, Defendant Oesterle again

highlighted the success of the PMM in the Company's most established markets:

*We are most often compared to Yelp.  They give their information away for free.* It's ratings and review information.  They have much higher user volume than we have, yet we drive more revenue and we're growing faster.  *And we've been operating* [–] *our most successful markets have been big markets where free services have a lot of scale.  So New York and LA are our two largest and fastest growing markets.  San Francisco, Yelp's home market, is one of our best*.

\*       \*       \*

*[B]y definition, we're the premium provider in the marketplace.  We charge. Other people don't*.  In exchange for charging, we have to provide very high quality data.

59.    Similarly, during the August 15 Conference, Defendant Howell represented that

the Company's ability to grow its paid membership base beyond mere introductory rates and "get

[members] through that first 30 months" to the point where they were paying higher rates was the catalyst for Angie's List to continue to grow the paid membership base, allowing the Company to "sign up" and continue to charge high-dollar advertising fees to service providers:

> What I will tell you is it's very much of a flywheel concept because the more members that you get through that first 30 months, the more service providers that sign up, the more service providers that sign up, it drives word-of-mouth with the membership and they feed on themselves.

60.     Each of Defendants' statements set forth above in ¶¶56-59 regarding the putative stability and predictability of the membership subscription revenues that the Company's PMM generated was materially false and misleading when made.   The Company's membership revenue stream depended upon, among other things, the Company's ability to transition beyond introductory rates in new markets and to maintain mature pricing points in the Company's oldest cohorts.  Despite representing that prices in both the most mature and newer markets were stable and rising, thus serving as an exemplar for the Company's growth potential, during the Class Period, the Company was in fact reverting to introductory rates and/or complimentary memberships in its most established markets in order to artificially grow its *paid* membership base.   These undisclosed measures materially compromised the PMM's "predictable revenue stream."  The material facts that Defendants misrepresented or failed to disclose included:

> a)     As the *Wall Street Journal* reported on October 2, 2013, the Company had materially compromised its self-proclaimed status as a premium provider of high-quality content, engaged users, and valuable leads by implementing massive new member subscription fee price cuts – discounted by as much as 75% – in its largest and most established cohorts, including Indianapolis, New York, Chicago, San Francisco, and Washington, D.C., among others.  Indeed, the *Wall Street Journal* reported, and the Company was forced to admit, that the Company was only able to charge near-introductory rates as low as $10 in the very same established cohorts the Company claimed "demonstrate[d] the potential for the entire business" and served as a "good guide for where [the Company] can get in the newer cohorts."

b)   Directly contrary to Defendants' representations that growth in the Company's largest cohorts had allowed the Company to "transition **beyond** introductory membership [rates]," the Company had reverted to introductory rates in those markets.

c)   The Company had materially compromised future revenues from its membership subscription fees because, as Defendant Oesterle stated in October 2013 after the undisclosed price cuts were revealed, the Company has decided that "[t]he price you [the new member] sign up at is the one you'll get renewed at."   Thus, contrary to Defendants' consistent Class Period representations, in even the oldest and most established cohorts, the Company was not transitioning beyond the introductory rates they were implementing.

d)   As the *Wall Street Journal* reported on October 2, 2013, rather than ***"maintain and potentially grow the size of our paid membership base*,**" the Company had materially compromised its relationship with existing members and thus its supposedly "high membership renewal rates" and "word of mouth referrals from existing members" by slashing prices for new members in existing markets, while continuing to charge existing members substantially higher fees for the same services in those same markets.

e)   Recognizing that the disclosure of Defendants' secret price slashing risked alienating the Company's supposedly loyal customer base, Defendant Oesterle represented that complaints from existing members about current rates were being handled on a "one-off basis."

f)   Despite representing that the "business was working well" and that New York was one of its largest and fastest-growing markets, and that San Francisco was one of its best markets, Defendants failed to disclose that the Company was drastically cutting "predictable" subscription fees in those markets in order to keep up with the "free" models to which the Company had assured investors it should not be compared, as evidenced by the October 2, 2013 *Wall Street Journal* article and the Company's own admissions therein.

61.   The same statements set forth in ¶57 concerning the Company's paid membership model were repeated in, or specifically incorporated by reference into the 1Q 2013 Form 10-Q and the 2Q 2013 Form 10-Q, each of which was signed by Defendant Hundt, and each of the statements was materially false and misleading when made for the same reasons set forth in ¶60.

62.   Throughout the Class Period, Defendants routinely linked the "highly qualified leads" that the Company claimed its PMM provided to Angie's List's ability to secure and retain lucrative advertising contracts with service providers.   In addition to the aforementioned materially false and misleading statements concerning the putatively "predictable revenue

23

stream" that the Company derived from the membership subscription fees that its PMM generated, the 2012 Form 10-K assured investors that Angie's List's PMM also gave rise to a "predictable revenue stream" through advertising contracts with service providers. Specifically, the Company represented that its "*high service provider renewal rates . . . as a percentage of initial contract value renewed, have provided us with a relatively predictable revenue stream*." This statement was subsequently repeated in the Company's 1Q 2013 Form 10-Q and in the Company's 2Q 2013 Form 10-Q.

63.     During the September 12 Conference, a Deutsche Bank analyst noted that "getting those renewal dollars" from service providers was "very critical" to the Company's profitability, and asked Defendant Oesterle whether he or the Company "worr[ies] at all that you'll be able to continue to get those big renewal amounts."  Defendant Oesterle responded by reassuring the public that "we've consistently improved those numbers . . . .  I have a high degree of confidence that we're delivering good value to these service companies and that we can drive very high renewal rates."

64.     Next, the analyst expressed concern regarding the Company's ability to maintain the high service provider renewal rates:  "You've been renewing your dollars at a pretty high rate.  Do you expect that to continue?  And I guess how contingent is that on maintaining end-user growth versus just pure kind of price hike?"  Defendant Oesterle responded:

> So the first part, yes, we expect to continue to maintain a high rate.  That's been a very positive trend for us the last few years.  I don't know – we've had some almost astronomically high rates a couple of times.  We may not be able to maintain those forever, but we expect a very, very high – as we sit here today, our renewal rates are running above 100%, the dollar renewal rates, and they have for some time.
>
> \*      \*      \*
>
> *There's no question that growing the member base helps us with renewal pricing.  The more density you get in a given market, the more valuable the territory becomes to the service company*.

24

\*       \*       \*

[W]e're going to keep growing the member base.  So, we sort of don't worry about it.  We intend to keep growing the member base and if that's true, then **we kind of don't have to worry about it too much.**

65.     Defendants' statements referenced above in ¶¶62-64 that revenue from advertising contracts with service providers and renewals of those contracts at rates 100% or more of the initial contract value constituted a "predictable revenue steam" were materially false and misleading when made because the Company was taking undisclosed actions that diluted its putative base of "highly qualified leads" and severely threatened the membership base underlying the predictability of the Company's service provider advertising revenue stream, including:

    a)     The Company had materially compromised its status as a "premium provider" of "high-quality" content and leads, by slashing new membership prices to negligible fees in its "most successful" cohorts, as reported by the *Wall Street Journal* on October 2, 2013, as set forth in ¶60.  Indeed, throughout the Class Period, Defendants repeatedly defined their ability to engage service providers by pointing to the putatively superior quality of the lead base that its PMM provided.

    b)     While Defendants repeatedly affirmed that the Company's ability to initiate advertising contracts with service providers, and to renew those contracts at rates exceeding 100% of the initial contract, was almost entirely predicated upon the Company maintaining and "growing the member base" – that is, the number of members who were paying substantial membership fees to access Angie's List – the Company was actively diluting the quality of the "leads" within its paid membership base.

    c)     As reported by the *Indianapolis Business Journal* on November 4, 2013, the Company had been struggling to grow its existing service provider base and was forced to drastically increase spend on initiating new advertising contracts with service providers, further impairing any positive results that the Company may obtain from its supposedly "predictable" service provide revenue stream.

    d)     As the Company disclosed in its 3Q 2013 Press Release, Angie's List was also struggling to maintain its existing advertising service provider base, reporting a 30% or greater churn of contracting service providers.  The Company's inability to maintain its existing service providers prevented the Company from continuing to initiate and renew paid advertising contracts at rates necessary to sustain the "predictable revenue stream" that Defendants claimed to derive from service providers throughout the Class Period.

25

66.     As alleged above, the undisclosed new member price reductions in the Company's most established markets jeopardized both the Company's membership affinity and revenues and its corresponding service provider advertising revenues – the core components of Angie's List's PMM.   Despite these undisclosed contemporaneous struggles, Defendants repeatedly represented during the Class Period that the Company's "business was working well" and made additional materially false and misleading representations concerning the status of business in the Company's largest and oldest cohorts and stability of the business as a whole.

67.     For instance, in the Company's 4Q/FY 2012 Press Release, Defendant Oesterle misleadingly stated that "[t]he operating characteristics of our oldest cohort continue to demonstrate the potential for the entire business."   That same day, during the Company's February 13 Conference Call, Oesterle emphatically stated that "***the business is just working well***" and that "we have got kind of everything working.   Angie's got the marketing side working, and Mike Rutz has the service provider side working.   It is just, yes, we are getting good broad-based growth. Good originations, good renewals. . . ."   He further assured investors that "[t]he numbers are up large enough where it [is] hard to – we are growing big numbers these days.   ***And it is all working***."   Based upon the purported strength of the PMM, Defendant Oesterle concluded that the Company was primed to "achieve a triple Lindy of sorts" and would "continue to rapidly grow revenue."   Similar positive and reassuring statements about the stability and viability of the PMM, which poised the Company for future growth, were made throughout the Class Period, including:

a)      At the March 5 Conference, Defendant Millard stated that "[w]hen you look at our oldest market cohort, it is growing very nicely…."   He then explained that "***the oldest cohort provides a path for the other cohorts***.  So the Indianapolis [market] also provides a path for all those other markets within that most mature cohort, so we believe we have a lot of room to grow and upside potential."

b)   During the April 24 Conference Call, Defendant Oesterle commented that the Company's "mature markets represent this wonderful case where they are profitable" and that "[t]o some degree, the entire business is shifting into that mode now."

c)   In the 1Q 2013 Press Release, Defendant Oesterle concluded that "[t]he operating characteristics of our oldest cohort continue to demonstrate the potential for the entire business."

d)   During the July 24 Conference Call, Defendant Oesterle stated that "I think [it is] very positive news that we continue to grow the oldest cohorts at rapid rates" and that "there is all good news in the mature cohort."

68.   The statements referenced above in ¶¶66-67 concerning the status of the business in the Company's oldest and most established cohorts and the stability of the business as a whole were materially false and misleading and lacked a reasonable basis in fact when made for the reasons set forth above in ¶¶60 and 65.

## VI.   THE TRUTH CONCERNING THE COMPANY'S PMM, ITS CORRESPONDING REVENUE STREAMS, AND THE STABILITY OF THE COMPANY'S BUSINESS GRADUALLY EMERGES

69.   The true facts concerning Defendants' false and misleading statements about the stability and predictability of the PMM's membership revenues and service provide revenues, and the putative success of Angie's List in the Company's oldest cohorts, did not begin to emerge until the end of 3Q 2013.

70.   Belying Defendants' Class-Period representations that the Company's PMM was "just working well" and that the results from Angie's List's oldest cohorts demonstrated that the Company was poised to "rapidly grow revenue," on September 30, 2013, Angie's List disclosed the sudden termination of the employment of Manu Thapar ("Thapar"), the Company's Chief Technology Officer ("CTO"), effective immediately on September 27, 2013 – without explanation – and without naming a replacement.  Investors were stunned by the September 30, 2013 disclosure of Thapar's termination from the internet-based Company, and the price of the Company's common stock declined by approximately 10%, falling from its close of $22.49 per

share on September 30, 2013, to close at $20.30 per share on October 1, 2013, on unusually high trading volume of more than 3.4 million shares.

71.     On October 2, 2013, just before the close of the trading day, the *Wall Street Journal* shocked investors when it revealed publicly for the first time in an article entitled, "Angie's List Cuts Prices, Pursuing New Members" that Angie's List had ***"slashed membership prices by roughly 75% in several key markets, in a bid to attract new members,"*** thus materially impacting the supposedly "predictable stream" of the Company's membership revenue.  The undisclosed membership price cuts undertaken in the Company's largest and most established markets were wholly contrary to Defendants' consistent representations during the Class Period that these markets were "the pathway for all subsequent cohorts to follow."  Indeed, Defendant Oesterle told the *Wall Street Journal* that new members in New York, Washington D.C., Chicago, San Francisco, ***and*** Indianapolis – each of which are located in the Company's two oldest cohorts – were now offered introductory-like rates of $10 for an annual membership, down from around $40.  This unprecedented move diluted the value of the membership base in the Company's core markets and impaired Angie's List's ability to secure and maintain new advertising contracts from service providers.  Accordingly, it was materially misleading for Defendants to refer to the consumer leads that the Company's watered-down PMM now generated as "highly qualified."

72.     Defendant Oesterle further disclosed that the "lower [subscriber] prices wouldn't immediately be available to existing subscribers," thus seriously compromising the Company's ability to maintain (through renewals or avoidance of cancellations), let alone continue to grow, its membership base, upon which the Company's PMM admittedly depended.  Recognizing the negative impact that the Company's decision to slash new membership prices in its most mature

28

markets would have on its longest-paying subscribers, Defendant Oesterle admitted that complaints from those members about being forced to renew at higher prices were being handled on a "one-off basis."

73.    In response to the revelation that Angie's List had actively diluted the affinity of the membership bases in the Company's oldest cohorts, and therefore jeopardized the Company's publicly represented "predictable" revenue stream derived from membership subscription fees, the Company's share price declined precipitously, dropping $3.68 per share (almost 18%) to $17.31 per share on October 3, 2013, on trading volume of more than 12.8 million shares – then, the largest single-day trading volume since the Company's IPO.

74.    On October 4, 2013, Deutsche Bank issued a report commenting on the Company's price cuts, which had not been previously reported.  In this report, Deutsche Bank observed that "[t]he [C]ompany's decision to 'test' lower prices across all major markets str[uck] [them] as odd" and further commented:

> Most Internet companies constantly test different plans, site changes, etc. but do so in different markets with control groups.  ***To see a broad test across most major markets including the oldest cohorts seems unusual to us***.   We acknowledge the supremacy of SP [service provider] revenue, but ***the [C]ompany has generally pointed to rising prices in newer markets - towards the pricing in older markets – as the path we should expect, not price cuts across all markets***. Given the [C]ompany's emphasis on the high value of its paying subscribers to its SP [service provider] advertising business, it's hard not to question whether a lower priced sub[scriber] can drive the same value for the business as its oldest subs[ribers].   Further, the CEO recently reminded investors at our Tech Conference presentation that tests of free many years ago failed.  ***The rapid end of the test, in what appeared to be a reaction to the stock price, also strikes us as odd***.

75.    In response to the surprise membership subscription rate cuts in the Company's most mature markets, Oppenheimer wrote on October 3, 2013 that it expected the stock to remain weak unless the Company pre-announced positive 3Q 2013 subscription trends.

Moreover, stock market commentator *Motley Fool* would later report on October 24, 2013 that the fact "the [C]ompany had randomly cut prices in major markets by up to 75%" prompted "**outrage from investors left in the dark**."

76.     Notwithstanding the drastic and previously undisclosed new member subscription rate cuts in the Company's most established markets, along with the Company's abrupt termination of its CTO's employment, Defendant Oesterle continued to mislead investors during the October 14 Interview when he rejected the notion that the Company was concerned about the status of the PMM and the Company's business prospects and represented that **the Company's "base business is executing extremely well**."  This representation was materially false and misleading when made for the same reasons set forth in ¶¶60 and 65.

77.     Disclosures of previously misrepresented and concealed facts concerning the PMM continued after the close of trading on October 23, 2013, when Angie's List issued the 3Q 2013 Press Release concerning its 3Q 2013 financial results and 4Q 2013 projections.

78.     As *Bloomberg* reported that same day, Angie's List's results and outlook fell well short of Wall Street expectations.  For instance, the Company disclosed that its 3Q 2013 revenues were only $65.5 million – lower than the expectations of securities analysts, whose mean estimate of revenues of approximately $66.1 million (with some expecting substantially higher revenues).  The Company also reported that its quarterly net losses were significantly greater than analysts' expectations – totaling $13.5 million, or $0.23 per share, versus consensus expectations of losses at only $0.20 per share.  Further, the Company projected 4Q 2013 revenues of $68-$69 million, missing analysts' expectations, who as a group expected forecasted revenues for that period of no less than $70.4 million.  In addition, the Company reported that marketing expenses had increased $2.1 million, or 8%, up to $28.2 million overall.  With respect

to service providers, the Company disclosed that in 3Q 2013, it had spent over $9,000 to acquire each new service provider, suggesting that the Company's current level of potential market penetration was close to saturation.

79.    Finally, Angie's List reported that – despite secretly and dramatically reducing new member rates – the Company had gained only 371,318 new subscribers, bringing the total to 2,378,867 – *a mere 10% increase during 3Q 2013* and far lower than the quarter-over-quarter increases of 20% and 16%, respectively, that the Company had experienced in similar periods in 2011 and 2012.  Critically, Angie's List's Form 10-Q for the 3Q 2013 filed with the SEC on October 24, 2013 (the "3Q 2013 Form 10-Q") further revealed that *in 3Q 2013 alone, approximately 155,000 members of the Company's "growing membership base" decided to quit the service, either by cancelling their memberships or electing not to renew*.

80.    Several market analysts following Angie's List immediately issued reports on the earnings miss announced on October 23, 2013, including:

   a)    Deutsche Bank reported that the Company's 3Q 2013 results were "below our estimates on most key metrics" and that "[t]here were a number of negative items in 3Q13" which "management attributed . . . to less effective marketing spend, including price tests that were cut short when they surfaced in the press."  Among other things, the report noted that because the Company "explained on numerous occasions the notion that service provider ad revenue tends to renew at 100%" or greater, the deceleration of "new service provider revenue growth" was "a concern."  Accordingly, Deutsche Bank decreased estimates and lowered its twelve month target a full $10.00, from $26.00 to $16.00.

   b)    Numerous analysts reported on the large gap between gross membership adds (371,300) and net adds (216,300) during 3Q 2013, a 155,000 difference, which Singular Research concluded "*impl[ied] the member churn rate remains high*."  Based upon the Company's 3Q 2013 results, Singular Research rated Angie's List common stock as a "sell" with an $11.00 twelve month price target.

   c)    In a report titled "Business Model Uncertainty Remains; Lowering PT to $24," MKM Partners commented that "ANGI reported a disappointing quarter, confirming concerns on membership growth. . . .  Revenue came at the low-end of guidance, dragging profitability lower."  Further, the report noted that the Company's decision to conduct "*a broader price test than previous tests*" created "*business model uncertainty [that] is causing anxiety among investors*."  As

such, MKM Partners concluded that "[o]ur call to buy the stock amidst controversy was a bad call" and lowered its twelve-month price target from $34 to $24.

81.     In response to these reports and downgrades, the share price of Angie's List's common stock declined even further, from a close of $15.45 per share on October 23, 2013 to close at $14.64 on October 24, 2012 (a decline of over 5%), on heavier than usual trading volume of more than 6.7 million shares.

82.     News and investment commentary appearing after the end of the Class Period on October 23, 2013 reflected the market's continuing concerns regarding the Company's disclosure of its disappointing 3Q 2013 results.  For instance, in a November 2, 2013 article published in *The Globe and Mail*, one commentator observed:

> [R]ecent results raise questions about just how big the company can get.  While Angie's List missed expectations on revenue and earnings in its most recent quarter, and cut its revenue guidance, ***the most troubling numbers it unveiled had to do with subscribers.  There were only 2.38 million of them, which was below net estimates, while net subscriber additions were smaller than the year before***.

83.     In addition, on November 4, 2013, the *Indianapolis Business Journal* published an article titled, "Angie's List falls after sales disappoint; Growth slows in sign-ups of new service providers," which stated:  "As the dust settles on the quarter, it's becoming clear that analysts are concerned about a particular aspect of the [C]ompany's performance:  It did not sign up as many new service providers."  In particular, the article noted that Angie's List's service provider revenue growth of 66% troubled analysts because "[i]t was slower than the 96-percent leap in the same quarter last year" and "[t]his key chunk of revenue also grew more slowly than the 72-percent increase in this year's second quarter."  The article went on to explain that while "[m]any companies would be thrilled to see sales rise 66 percent[,] . . . this is the rarified world of a fast-growing Web company, whose eventual plan for profitability is predicated on building out its service in cities around the country."

32

## VII.   DEFENDANTS' SCIENTER

84.     As alleged herein, Defendants acted with scienter in that each Defendant:   (i) knew or recklessly disregarded that the public statements or documents issued or disseminated in the name of the Company (or in their own name) were materially false and misleading when made; (ii) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.   Defendants, by virtue of their receipt of information reflecting the true facts regarding Angie's List, and their control over, receipt and/or modification of Angie's List's materially misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

85.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public, which artificially inflated the trading prices of the Company's common stock during the Class Period.   The misrepresentations and omissions of material fact described herein concerning the PMM and its two symbiotic core components – paid membership revenues and service provider advertising revenues – could not have been made during the Class Period without the knowledge and complicity or reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

86.     Each Individual Defendant, because of his or her position with Angie's List, controlled the contents of the Company's public statements during the Class Period.   Each Individual Defendant was provided with, or had access to, copies of the documents alleged herein to be false and/or misleading prior to or shortly after, their issuance, had access to the data underlying the representations therein, including membership revenues and service provider

advertising revenues from the Company's PMM, and had the ability and opportunity to prevent the materially false and misleading statements from being made and/or to cause them to be corrected.  Because of his or her position and access to material non-public information, each Individual Defendant knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were materially false, misleading, and incomplete.  As a result, each Individual Defendant is responsible for the accuracy of Angie's List's corporate statements, and each is therefore responsible and liable for the representations contained therein and/or omitted therefrom.

87.     As alleged herein, numerous facts support a strong inference that, during the Class Period, each Defendant knew or recklessly disregarded that neither of the two primary revenue streams derived from Angie's List's PMM was stable or "predictable," as Defendants consistently represented.  The Company's entire business was not only struggling to replicate the results of its most mature cohorts in new markets, but Angie's List had also elected to dramatically cut new member subscription fees within those same mature cohorts – directly diluting the predictability of the very membership revenue stream that Defendants highlighted in many of their Class-Period statements.  Because the fraud alleged herein directly involves the very core components of Angie's List's business – the membership revenue and service provider revenue "flywheel" that Defendants pointed to as the key to the PMM's success – knowledge of the true, but misrepresented and/or concealed facts underlying the statements alleged to be materially false and misleading herein may be imputed to Defendants.

88.     ***First***, the fact that the Company's reduction of its membership prices was so drastic and involved the Company's most significant markets—slashing subscription prices by as

much as 75% to attract new members in many of the Company's largest and oldest cohorts, including Indianapolis, New York, Chicago, San Francisco, and Washington, D.C.—supports a strong inference of Defendants' scienter.   Because such price cuts clearly and materially impacted the Company's revenue derived from membership subscription fees in the very markets that Defendants represented to "demonstrate the potential for the entire business," Defendants knew and/or recklessly disregarded that their representations regarding the "predictability" of the PMM's membership revenue stream were materially false and misleading when made.

89.    **Second**, the fact that the Company's membership price cuts concerned the central value proposition of the Company's PMM—its paid membership base—is further strong evidence of Defendants' scienter.   As alleged herein, the Company claimed that its paid membership base distinguished the PMM from free consumer review websites offered by competitors because the PMM provided:   (i) reliable, high-quality content generated by motivated and engaged subscribers; and (ii) a large target market of "highly qualified" customer leads for local service providers.   The fact that the misstatements and omissions alleged herein regarding the "predictability" of the Company's membership revenue stream struck directly at the heart of the Company's PMM, which purportedly gave the Company its key competitive advantage in the marketplace, further supports a strong inference of scienter.

90.    **Third**, Defendants' scienter is demonstrated by the fact that the viability and long-term profitability of the Company's core business model – the PMM – is predicated upon the "operating characteristics of [its] oldest cohorts."   As alleged herein, the Company's transition from offering complimentary memberships to introductory rates to more significant rates in its most mature cohorts over a 24-month time period was publicly portrayed as "the pathway for all subsequent cohorts to follow."   The fact that the misstatements and omissions alleged herein

35

concerned the PMM in Angie's List's most mature cohorts, which Defendants represented were the "pathway" for the Company's success and future growth, is also evidence of Defendants' scienter.

91.     ***Fourth***, the fact that the Company's key growth strategy under the PMM focused on generating increased revenue from its two primary sources— membership subscription fees and service provider advertising sales—further gives rise to a strong inference of Defendants' scienter.   Specifically, as alleged herein, the PMM purportedly positioned the Company for future growth through a "flywheel" concept by:  (i) increasing the Company's paid membership base; which (ii) positions the Company to drive additional service provider revenue by offering a larger pool of attractive customer leads.   Because the Company's price-slashing obviously and materially compromised its key growth strategy by:  (i) reducing the growth and quality of the Company's membership revenues; (ii) impeding the Company's ability to increase membership revenues in the future; and (iii) diminishing the quality of the customer leads that supported higher advertising rates driving increased service provider revenue, Defendants knew and/or recklessly disregarded that their representations concerning the "predictability" of the Company's two revenue streams and the ongoing success of the PMM were materially false and misleading when made.

92.     Angie's List knowingly and/or recklessly made the materially false and/or misleading statements and omissions of material fact alleged herein based on the fact that the Individual Defendants identified above, namely, the Company's CEO, CFO(s), CAO, COO and CMO throughout the Class Period, knew and/or recklessly disregarded that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that

such statements were made.  Each of these Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management.

93.     The Individual Defendants' actions materially compromised the predictability of the Company's membership and service provider revenue streams.  The acts and knowledge of the Individual Defendants may be imputed to the Company and its senior management based upon, among other things:   (i) the numerous Class Period statements that the Individual Defendants themselves made or authorized concerning the putative success of the PMM; (ii) the publicly represented importance of the Company's PMM, its paid membership base, and the purportedly predictable revenue streams derived therefrom, which Angie's List admitted were critical to both the Company's soundness and stability; and (iii) the sheer size of the new member price cuts in the Company's largest and most-established markets – the very cohorts that Defendants consistently highlighted as the example for all new and emerging markets to follow.  As a result, there is a cogent and compelling inference that each Individual Defendant and Angie's List knew or recklessly disregarded that the misstatements and omissions alleged herein were materially false and misleading when made.

## VIII.   LOSS CAUSATION

94.     The material misrepresentations and omissions detailed above had the effect of creating and maintaining artificially inflated prices for Angie's List common stock throughout the Class Period.  Lead Plaintiff and other Class members purchased or otherwise acquired Angie's List common stock at prices that were artificially inflated by Defendants' misrepresentations and omissions of material fact alleged herein.  Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Angie's List common stock served to maintain the price of Angie's List common stock at an artificially inflated level.

95.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.  Throughout the Class Period, Defendants made materially false and misleading statements and omissions of material fact concerning the stability and predictability of the revenue streams that the Company's PMM was providing and the ongoing success of the business, which artificially inflated the price of Angie's List common stock.  Defendants also misleadingly contended that the Company's business was "working well."  Had the Defendants been truthful about these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Angie's List common stock, or would not have purchased or otherwise acquired their shares at the artificially inflated prices at which they were offered.

96.     As a direct result of Defendants' misrepresentations and omissions of material facts, the price of Angie's List common stock was artificially inflated throughout the Class Period.  This artificial inflation was removed from the price of Angie's List common stock as the truth about the supposed ongoing success and long-term sustainability of the Company's PMM, including its ability to generate stable and predictable membership and service provider revenues, was gradually revealed and/or the concealed risks materialized as alleged above in ¶¶69-83 and below in ¶¶97-102, causing investors' losses.

97.     On September 30, 2013, the Company disclosed in a Form 8-K that "Chief Technology Officer Manu Thapar's employment had ended effective September 27, 2013."  This sudden termination of the CTO of an internet-based company first revealed that, despite Defendants' numerous positive representations during the Class Period, Angie's List core business, primarily the Company's PMM, was not "just working well."  In direct response to this partial disclosure and/or partial materialization of the risk presented by Defendants'

misrepresentations and/or omissions of material fact, the price of the Company's common stock fell by $3.59 per share, or over 15% from a close of $23.89 per share on September 27, 2013 to close at $20.30 per share on October 1, 2013 on heavier than usual trading volume of approximately 3.4 million shares.

98.    As alleged above in ¶¶71-72, near the close of the trading day on October 2, 2013, the *Wall Street Journal* reported that Angie's List had secretly "slashed membership prices by roughly 75% in several key [mature] markets," including those in New York, Washington D.C., Chicago, San Francisco *and* Indianapolis, reverting to introductory rates in each market in a bid to attract new members.  This disclosure materially impacted the supposedly predictable membership and service provider revenue streams that the Company's PMM produced.  Indeed, Defendant Oesterle was forced to disclose that new members in these and other major markets located within the Company's two oldest cohorts were now being charged and paying only around $10 for an annual membership, down from around $40.  Further, Defendant Oesterle stated that these lower rates would not be available to existing subscribers, thus seriously compromising the Company's ability to maintain (through renewals or avoidance of cancellations) its membership base.

99.    In direct response to the October 2, 2013 disclosure, which partially revealed that Defendants' Class Period representations concerning the stability and predictability of the PMM's membership and service provider revenue streams were materially false and misleading, the price of Angie's List common stock declined by $3.68 per share, or over 17%, from a close of $20.99 per share on October 2, 2013 to close at $17.31 per share on October 3, 2013 on heavier than usual trading volume of more than 12.8 million shares – then the largest single day trading volume since the Company's IPO.

100.    Contemporaneous analyst commentary reflected that Thapar's September 30, 2013 termination and the October 2, 2013 disclosure of the massive membership price cuts in the Company's oldest and most established cohorts partially revealed that Defendants' Class Period representations that Angie's List was "just working well" were materially false and misleading. In this regard, a Deutsche Bank analyst noted in response to Thapar's termination and the news of the price cuts, which had not been previously reported, that the "strategic lurches and sudden executive departures—with no immediate replacements—[are] potentially symptomatic of other problems." Deutsche Bank perceived the price slashing as unusual, given that Angie's List had "*generally pointed to rising prices in newer markets - towards the pricing in older markets – as the path we should expect, not price cuts across all markets*" and noted that the "*rapid end of the test, in what appeared to be a reaction to the stock price, also strikes us as odd*."

101.    Despite Defendant Oesterle's efforts at damage control during the October 14 Interview, the risk created by Defendants' secret and material reductions of new member subscription prices in the Company's oldest cohorts further materialized after the end of the trading day on October 23, 2013, when Angie's List announced its 3Q 2013 financial results in the 3Q 2013 Press Release. As *Bloomberg* reported that same day, Angie's List's results and outlook fell well short of Wall Street expectations, as set forth above in ¶¶77-78. Among other things, the Company disclosed that the growth of both its membership base and new service provider revenue was stalling. This announcement represented a further materialization of the undisclosed risk created by Defendants' decision to materially reduce new member subscription rates in the Company's most mature cohorts, and signaled to the market that Angie's List's PMM was not "working well," as Defendants repeatedly claimed during the Class Period.

102.     In response to the Company's disappointing 3Q 2013 results, the share price of Angie's List declined from a close of $15.45 per share on October 23, 2013 to close at $14.64 on October 24, 2012 on heavier than usual trading volume of more than 6.7 million shares.

103.     It was entirely foreseeable to Defendants that misrepresenting and concealing from the public material facts regarding, *inter alia*:  (i) the predictability and stability of the Company's core revenue streams; and (ii) the ongoing success of the Company's business, would artificially inflate the price of Angie's List common stock.  It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements, would cause the price of Angie's List common stock to decline as the inflation caused by the Company's earlier materially false and misleading statements and omissions of material fact was removed from the stock price.

104.     Accordingly, the conduct of Defendants as alleged herein proximately caused foreseeable losses for Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Angie's List common stock during the Class Period.

105.     The timing and magnitude of the price decline in Angie's List common stock negates any inference that the losses suffered by Lead Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock and the subsequent significant decline in the value of Company's common stock when the truth was revealed.

41

106.    As a result of these revelations, and the corresponding drops in the price of Angie's List common stock, Lead Plaintiff and other Class members have suffered economic loss.

## IX.   LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

107.    At all relevant times, the market for Angie's List common stock was open and efficient for the following reasons, among others:

a)    Angie's List common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient electronic stock market;

b)    As a registered and regulated issuer of securities, Angie's List filed periodic public reports with the SEC;

c)    Angie's List regularly communicated with public investors via established market communication mechanisms, including regularly disseminating press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as conference calls with analysts and investors and other communications with the financial press and other similar reporting services; and

d)    Angie's List was followed by securities analysts employed by major brokerage firms, including Deutsche Bank, Oppenheimer, Canaccord Genuity and Piper Jaffray, which authored reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

108.    As a result of the foregoing, the market for Angie's List common stock promptly digested current information regarding the Company from all publicly available sources, and the prices of Angie's List common stock reflected such information.  Based upon the materially false and misleading statements and omissions of material fact alleged herein, Angie's List common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiff and all other members of the Class purchased Angie's List common stock relying upon the integrity of the market price of Angie's List common stock and other market information relating to Angie's List.

109.    Under these circumstances, all Class members suffered similar injuries through their purchases  and/or acquisitions of Angie's List common stock at artificially inflated prices, and the presumption of reliance under the fraud-on-the-market doctrine applies.

110.    Further, at all relevant times, Lead Plaintiff and the other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Angie's List common stock at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its operations, Lead Plaintiff and the other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972) ("*Affiliated Ute*").

## X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

111.    The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

112.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

113.    To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.  As set forth above in detail, given

the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

114.   To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false and/or misleading forward-looking statement because at the time such statement was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of Angie's List who actually knew that the statement was false.

115.   Moreover, to the extent that the Company and the Individual Defendants issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because Angie's List and the Individual Defendants had actual knowledge of existing, but undisclosed, material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## XI.   CLASS ACTION ALLEGATIONS

116.   Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all other persons who purchased or otherwise acquired Angie's List common stock during the Class Period, and were damaged thereby.   Excluded from the Class are:   (i) Defendants; (ii) present and former directors or executive officers of the Company, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii))); (iii) any of the foregoing individuals' or entities' legal representatives, heirs, successors, or assigns; and (iv) any entity in which any Defendant has a controlling interest, or which is related to, or affiliated with, any Defendant.

117.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.   While the precise number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are likely hundreds, if not thousands, of Class members.   At the end of the Class Period (as of October 23, 2013), there were approximately 96.6 million shares of Angie's List common stock outstanding and actively trading on the NASDAQ.   The names and addresses of Class members can be ascertained from the books and records of Angie's List or its transfer agent, and notice of this action can be provided to Class members by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

118.     Lead Plaintiff does not possess any interests that are antagonistic to the interests of the other members of the Class, and Lead Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class.   Lead Plaintiff has retained competent and experienced counsel, and Lead Plaintiff intends to prosecute this action vigorously.

119.     Lead Plaintiff's claims are typical of the claims of all other members of the Class because Lead Plaintiff's and all of the other Class members' claims and associated damages arise from, and were caused by, purchasing or otherwise acquiring Angie's List common stock at prices that were artificially inflated by the same materially false and misleading statements and/or omissions of material fact made by, or chargeable to, Defendants.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

120.    A class action is superior to other available methods for fairly and efficiently adjudicating Class members' claims.   Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to otherwise seek redress for Defendants' wrongful conduct.   Moreover, the prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

121.    Lead Plaintiff knows of no difficulty that will be encountered in managing this litigation that would preclude its maintenance as a class action.

122.    Common questions of law and fact exist as to all members of the Class, and such common questions predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to members of the Class are:

a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)      whether Defendants' statements issued during the Class Period were materially false and misleading and/or omitted material facts;

c)      whether and to what extent the market price of Angie's List common stock was artificially inflated and/or distorted during the Class Period due to the misrepresentations and/or omissions of material fact complained of herein;

d)      whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

46

e)      whether Class members' reliance may be presumed pursuant to the fraud-on-the-market doctrine; and/or *Affiliated Ute*; and

f)      the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## XII.   CAUSES OF ACTION

<u>COUNT I</u>

<u>For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants Other than Defendant Hicks Bowman</u>

123.    Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is brought against all Defendants, other than Defendant Hicks Bowman, pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by Lead Plaintiff on behalf of itself and all other members of the Class.

124.    During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to knowingly and/or recklessly make and/or approve the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Lead Plaintiff and the other Class members; (ii) artificially inflate and/or maintain the market price of Angie's List common stock; and (iii) cause Lead Plaintiff and the other members of the Class to purchase or otherwise acquire Angie's List common stock at artificially inflated prices.  In furtherance of their unlawful scheme, plan, and course of conduct, Defendants took the actions alleged herein.

125.    While in possession of material adverse non-public information, Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange:

(i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Angie's List common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   As alleged herein, the material misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, materially false and/or misleading representations and omissions during the Class Period regarding:   (i) the viability and predictability of membership revenues; (ii) the viability and predictability of service provider advertising revenues; and (iii) the success and functionality of the Company's PMM.  All Defendants, other than Defendant Hicks Bowman, are sued as primary participants in the wrongful conduct alleged herein.

126.   By virtue of their high-level positions at the Company during the Class Period, Defendants Oesterle, Hundt, Howell, and Millard were authorized to make public statements, and made public statements during the Class Period on Angie's List's behalf.   Defendants Oesterle, Hundt, Howell, and Millard were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they either knew, or recklessly disregarded, was materially false and misleading.

127.   In addition to the duties of full disclosure imposed on Defendants Oesterle, Hundt, Howell, and Millard as a result of making affirmative statements and reports to the investing public, these Defendants also had a duty to disclose information required to update

and/or correct their prior misstatements and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events.  Further, these Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01 et seq.) and Regulation S-K (17 C.F.R. Section 229.10 *et seq*.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information.  Defendants Oesterle, Millard, and Hundt also had duties under the Sarbanes-Oxley Act of 2002 to ensure that Angie's List's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

128.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were done knowingly or recklessly, and for the purpose and effect of concealing the truth with respect to Angie's List's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

129.   The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Angie's List's common stock during the Class Period.  In ignorance of the fact that the market prices of Angie's List's common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, and on the integrity of the market in which the Company's common stock trades, or on the absence of material adverse

information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased Angie List's common stock during the Class Period at artificially inflated prices. As the previously misrepresented and/or concealed material facts eventually emerged, the price of Angie's List's common stock substantially declined.

130. At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class known the truth with respect to the business, operations, performance, and prospects of Angie's List, which was misrepresented and/or concealed by Defendants, Lead Plaintiff and the other members of the Class would not have purchased Angie's List's common stock, or if they had purchased such stock, would not have done so at the artificially inflated prices that they paid.

131. By virtue of the foregoing, Defendants Angie's List, Oesterle, Hundt, Howell, and Millard have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

132. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their Class-Period purchases and/or acquisitions of the Company's common stock.

<u>**COUNT II**</u>

<u>**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**</u>

133. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Claim is brought against each of the Individual Defendants

pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a) by Lead Plaintiff on behalf of itself and all other members of the Class.

134.    During the Class Period, each of the Individual Defendants was a senior executive officer and/or director of Angie's List and was privy to, and monitored, confidential and proprietary information concerning Angie's List, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

135.    Because of his or her high-level position at Angie's List, each of the Individual Defendants had regular access to non-public information about its business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to him or her in connection therewith.

136.    Each of the Individual Defendants acted as and was a controlling person of Angie's List within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of his or her high-level positions, participation in the Company's day-to-day operations, and knowledge of the statements filed by the Company with the SEC and other statements disseminated to the investing public, each of the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiff alleges were materially false and misleading and/or omitted material facts.  Each of the Individual Defendants was provided with, or had unlimited access to, copies

of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after those statements were issued, and each Individual Defendant had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

137.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  In this regard, Howell made the following statement about Oesterle and Hicks during the August 15 Conference:  "Bill and Angie, the founders of the Company, they were the first two employees of the Company and they have been actively involved and engaged together in leading the Company every day along the way."

138.    As set forth above, the Individual Defendants (other than Defendant Hicks Bowman) and Angie's List violated Section 10(b) and Rule 10b-5 by making or causing to be made the materially false and misleading statements and omissions of material fact alleged herein.  By virtue of each Individual Defendant's position as a controlling person, and his or her participation in the underlying violations of Section 10(b) and Rule 10b-5, each of the Individual Defendants is also liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of the Company's stock during the Class Period.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief and judgment, including:

A.     Determining this action to be a proper class action under Federal Rules of Civil Procedure 23, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff's counsel as Lead Counsel and Liaison Counsel for the Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including any applicable and recoverable interest thereon;

C.     Awarding Lead Plaintiff and the other members of the Class the reasonable costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

D.     Awarding such other and further relief as may be just and proper.

### JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.


Dated:  August 29, 2014                                Respectfully Submitted,

                                                       **KESSLER TOPAZ**
                                                       **MELTZER & CHECK LLP**

                                                       */s/Michael K. Yarnoff*
                                                       Michael K. Yarnoff
                                                       Johnston de F. Whitman, Jr.
                                                       Meredith L. Lambert
                                                       Joshua A. Materese
                                                       280 King of Prussia Road
                                                       Radnor, PA 19087
                                                       Telephone: (610) 667-7706
                                                       Facsimile: (610) 667-7056

myarnoff@ktmc.com
jwhitman@ktmc.com
mlambert@ktmc.com
jmaterese@ktmc.com

*Lead Counsel for Lead United Food &*
*Commercial Workers Local 464A – Pension*
*Fund and the Class*

**PRICE WAICUKAUSKI & RILEY, LLC**
Ronald J. Waicukauski
Brad A. Catlin
Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-8787
Facsimile: (317) 633-8797
rwaicukauski@price-law.com
bcatlin@price-law.com

*Liaison Counsel for Lead Plaintiff United*
*Food & Commercial Workers Local 464A –*
*Pension Fund and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 29, 2014.

*/s/Michael K. Yarnoff*_____
Michael K. Yarnoff
