UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| **EVA and HAROLD BARON, individually and on behalf of all others similarly situated,** )<br>)<br>) | |
| **Plaintiffs,** )<br>) | |
| vs. ) | CAUSE NO.  1:13-cv-2032-WTL-TAB |
| )<br>**ANGIE'S LIST, INC., et al.,** )<br>) | |
| **Defendants.** ) | |

**ENTRY ON DEFENDANTS' MOTION TO DISMISS**

This cause is before the Court on the Defendants' motion to dismiss (Dkt. No. 75).  This motion is fully briefed and the Court, being duly advised, **GRANTS** the motion for the following reasons.

### I.  BACKGROUND

Investors in Angie's List, Inc. ("Angie's List"), a publicly-traded corporation with its principal place of business in Indianapolis, Indiana, have filed this putative class action alleging that corporate and individual officer malfeasance was responsible for Angie's List stock-price decline in 2013.  The class period asserted by the Plaintiffs extends between February 13, 2013, and October 23, 2013.

Angie's List operates a subscription-based website that publishes customer reviews of "high cost of failure" services, i.e., home remodeling, plumbing, and roofing.  "Highly rated" service providers—those who receive an "A" or "B" on an A through F scale—are then invited to advertise on the website, offering discounts and other promotions to Angie's List members. Lead Plaintiff United Food & Commercial Workers Local 464A Pension Fund ("Local 464A") filed a Consolidated Class Action Complaint ("the Complaint") (Dkt. No. 65) alleging that

Angie's List, its Chief Executive Officer William S. Oesterle, its Chief Marketing Officer Angela R. Hicks Bowman, its Chief Accounting Officer Charles Hundt, its Chief Operating Officer Mark Howell, and its Chief Financial Officer Robert R. Milliard made materially false and misleading statements regarding: 1) the stability and predictability of the two core revenue streams that the paid membership model ("PMM") provided to Angie's List; and 2) Angie's List's present success and long-term sustainability based upon those streams. The facts alleged in the Plaintiffs' Complaint are as follow.

### A. The Paid Membership Model

The PMM is unique to Angie's List and sets it apart from its competitors. In order to be a member of Angie's List—to have access to the website and the ability to post and view ratings of service providers—one has to pay a subscription fee. This is in contrast to, for instance, Yelp!, where anyone—for free—can post a review and read reviews posted by others. The benefits of the PMM were touted by the Defendants as follows: 1) it creates a membership base of consumers who are motivated, engaged, and willing to provide meaningful, reliable reviews; and 2) it provides a superior advertising platform for local service providers, as the membership base is comprised of "engaged, affluent, educated, and busy" consumers. Compl. ¶ 29. By charging membership fees, Angie's List was able to offer "a premium product." *Id*. ¶ 13.

The PMM generated a so-called "flywheel" of two separate, but related, predicable revenue streams: 1) membership subscription fees (which accounted for approximately 27% of Angie's List revenue in 2013); and 2) paid advertising contracts with local service providers (which accounted for approximately 73% of Angie's List revenue in 2013). As Defendant Howell stated, "the more members that [sign up], the more service providers that sign up[;] it drives word-of-mouth with the membership and they feed on themselves." *Id*. ¶ 30.

### B. Expansion into New Markets

Since its inception in 1995, Angie's List has been expanding across the nation; it is now available in 253 markets. Angie's List divides its markets into cohorts according to the time period in which the markets transition to the PMM. For example, markets that were established prior to 2003, including Indianapolis, New York, San Francisco, and Washington, D.C, are the oldest, most mature cohort. Markets established after 2010 are the newest cohort.

The key growth strategy for Angie's List is to aggressively advertise in new markets to increase the membership base and expand the number of customer reviews. In order to accomplish this, Angie's List offers complimentary memberships to new members in the new markets. Within 24 to 30 months, the complimentary memberships transition to introductory rate memberships and then to fully paid memberships. Angie's List touted obtaining paid memberships as the key to its success; this is what gave it "an engaged user." *Id*. ¶ 37. As Defendant Oesterle noted, paying members are "ready, willing and able to consume the services, which makes them unbelievably valuable for the service companies." *Id*. Thus, the broader base of loyal and engaged members increased the number of local service providers that desired to advertise on the website, which in turn increased the advertising rates. This model of expansion was represented to work in Angie's List oldest and most mature cohort and was touted as providing a path for future expansion into new markets.

### C. Price Cuts

In 2013, Angie's List began cutting the price of membership subscriptions in its oldest cohort. Specifically, "Angie's List dramatically reduced new member subscription fees by as much as 75% by offering memberships at near-complimentary introductory rates in established

markets, such as Indianapolis, New York, Chicago, San Francisco, and Washington D.C., among others." *Id*. ¶ 54.  The Complaint alleges that Angie's List

> was [thus] effectively abandoning the core value proposition of the Company's PMM which:  (i) compromised the predictability of the revenue derived from its member subscription fees; and (ii) impaired the PMM's ability to offer service providers a "qualified" and "engaged" pool of potential customers—the very asset that the Company routinely touted as the critical feature in securing and maintaining advertising revenues and in differentiating itself from its competitors.

*Id*.

### D.  Defendants' Allegedly Misleading Statements

According to the Plaintiffs, the Defendants made several fraudulent statements between February and October 2013.  Specifically, the Complaint alleges that the

> Defendants' Class Period statements . . . were materially false and misleading when made because Defendants knowingly or recklessly misrepresented and/or failed to disclose that in order to remain competitive with the growing number of free services offered within the same markets where the Company operated, Angie's List was slashing membership prices charged to new members in existing markets—including in the Company's "oldest cohorts" and most well-established markets[.]"

*Id*. ¶ 9.

On February 13, 2013, Angie's List announced its fourth quarter 2012 financial results.  In the accompanying press release, Defendant Oesterle contributed much of Angie's List's success to its oldest, most mature cohort, stating that "the operating characteristics of our oldest cohort continue to demonstrate the potential for the entire business." *Id*. ¶ 56.  Similarly, in Angie's List's 2012 Form 10-K, 1Q 2013 Form 10-Q, and 2Q 2013 Form 10-Q, signed by Defendants Oesterle, Millard, and/or Hundt, the PMM was emphasized, noting that "subscription fees from members represent a significant source of working capital and provide a relatively predicable revenue stream," and that "the markets in these older cohorts have begun to achieve

penetration rates that allow us to transition beyond introductory membership and advertising rates." *Id*. ¶ 57.

During the May 21, 2013, conference, the PMM was again the emphasis. Defendant Oesterle noted that Angie's List was "the premium provider in the marketplace" because "[w]e charge. Other people don't." *Id*. ¶ 58. Defendant Howell similarly highlighted the success of the PMM during the August 15, 2013, conference, noting that "the more members that you get through that first 30 months, the more service providers that sign up[;] it drives word-of-mouth with the membership and they feed on themselves." *Id*. ¶ 59.

The Complaint alleges that these statements were materially false and misleading when made because

> [t]he Company's membership revenue stream depended upon, among other things, the Company's ability to transition beyond introductory rates in new markets and to maintain mature pricing points in the Company's oldest cohorts. Despite representing that prices in both the most mature and newer markets were stable and rising, thus serving as an exemplar for the Company's growth potential, during the Class Period, the Company was in fact reverting to introductory rates and/or complimentary memberships in its most established markets in order to artificially grow its paid membership base. These undisclosed measures materially compromised the PMM's "predictable revenue stream."

*Id*. ¶ 60.

Other misleading statements were made regarding "Angie's List's ability to secure and retain lucrative advertising contracts with service providers." *Id*. ¶ 62. In Angie's List's 2012 Form 10-K, 1Q 2013 Form 10-Q, and 2Q 2013 Form 10-Q, signed by Defendants Oesterle, Millard, and/or Hundt, Angie's List touted the contracts with local service providers as a providing "a relatively predicable revenue stream." *Id*. During the September 12, 2013, conference, Defendant Oesterle reiterated the importance of renewing the local service providers' contracts. He stated that

> [t]here's no question that growing the member base helps us with renewal pricing. The more density you get in a given market, the more valuable the territory becomes to the service company. . . . I have a high degree of confidence that we're delivering good value to these service companies and that we can drive very high renewal rates.

*Id.* ¶ 64. The Complaint alleges that these statements "were materially false and misleading when made because the Company was taking undisclosed actions that diluted its putative base of 'highly qualified leads' and severely threatened the membership base underlying the predictability of the Company's service provider advertising revenue stream." *Id.* ¶ 65.

Other allegedly false and misleading statements continued to be made for the same reasons noted above during the Class Period. During the March 5, 2013, conference, Defendant Millard noted that "the oldest cohort provides a path for the other cohorts." *Id.* ¶ 67. Similarly, in the 1Q 2013 Press Release, Defendant Oesterle said that "the operating characteristics of our oldest cohort continue to demonstrate the potential for the entire business." *Id.* During the April 24, 2013, conference call, Defendant Oesterle again noted that the "mature markets represent this wonderful case where they are profitable." *Id.* Finally, during the July 24, 2013, conference call, Defendant Oesterle reiterated that "it is very positive news that we continue to grow the oldest cohorts at rapid rates" and "there is all good news in the mature cohort." *Id.*

### E. Angie's List Stock Prices Drop

On September 20, 3013, Angie's List disclosed that its Chief Technology Officer Manu Thapar had been terminated on September 27, 2013; no replacement was named. Following this announcement, Angie's List common stock declined by approximately 10%—from $22.49 per share to $20.30 per share.

On October 2, 2013, the *Wall Street Journal* reported that Angie's List "slashed membership prices by roughly 75%," reducing the membership fee from around $40 to around

6

$10. Following this report, the price of Angie's List common stock fell almost 18%—from $20.99 per share to $17.31 per share.

On October 23, 2013, Angie's List released is third quarter 2013 financial results, which missed analysts' expectations. Angie's List disclosed that its third quarter 2013 revenue was $65.5 million (analysts expected approximately $66.1 million in revenue) and projected that its fourth quarter 2013 revenue would be $68 to $69 million (analysts forecasted revenue of $70.4 million). It disclosed that it spent $28.2 million on marketing expenses (an 8% increase) and spent $9,000 to acquire each new local service provider. Finally, it reported that it experienced a 10% increase in new subscribers (in contrast to increases of 20% in 2011 and 16% in 2012) and lost 155,000 members. Following this, the price of Angie's List common stock fell approximately 5%—from $15.45 per share to $14.64 per share.

### F. Procedural History

In late 2013 and early 2014, complaints were filed in this Court by a variety of Plaintiffs—who purchased Angie's List stock during the Class Period—on behalf of themselves and those similarly situated. Those cases were consolidated into the present action. *See* Dkt. No. 50. Local 464A, a joint-labor-management-sponsored trust fund established to provide retirement benefits to members of Local 464A, was appointed as lead plaintiff, and its selection of counsel was approved by this Court on June 16, 2014. *See id.*

The Complaint alleges two Counts against the Defendants: 1) violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10B-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5; and 2) violations of § 20(a) of the Exchange Act against the individual Defendant officers.

## II.  APPLICABLE STANDARD

The Defendants move to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the Complaint fails to state a claim for which relief can be granted.  In reviewing a Rule 12(b)(6) motion, the Court "must accept all well pled facts as true and draw all permissible inferences in favor of the plaintiff." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012).

In addition, Rule 9(b) governs pleading requirements in fraud actions generally, providing that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Therefore, "[a] complaint alleging fraud must provide the who, what, when, where, and how." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotation marks omitted).

Finally, the Private Securities Litigation Reform Act ("PSLRA") further heightens the pleading standard for plaintiffs alleging securities fraud claims.  The Act requires that, if a plaintiff alleges that the defendant either made an untrue statement of material fact or failed to state a material fact necessary in order to keep statements from being misleading, the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).  In addition, a plaintiff must, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

## III.   **DISCUSSION**

Count I of the Plaintiffs' Complaint alleges violations of Section 10(b) of the Exchange Act.  That provision provides, in relevant part, the following:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b-5, promulgated pursuant to Section 10(b), makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Defendants move to dismiss the Complaint in its entirety arguing that the Plaintiffs have failed to state a claim under these provisions.  While the Defendants set forth a variety of reasons why the Complaint fails, the Court need only address one, as it is dispositive.

In their response, the Plaintiffs set forth "what this case is really about." Pls.' Resp. at 1. They note that the Defendants' statements were materially false and misleading regarding:  1) "the stability and 'predictability' of the two core revenue streams that the Company's paid membership model (the "PMM") provided"; and 2) "how the Company's 'oldest cohorts'

9

typified the PMM's present success and long-term sustainability." *Id*. The Court agrees with the Defendants that the Complaint fails to state a claim with regard to both allegations.

### A. Statements Regarding the Stability and Predictability of the Two Core Revenue Streams

As noted above, the two core revenue streams the PMM provides to Angie's List are membership fees and contracts with local service providers. The streams are very much intertwined; as the membership base increases, more local service providers are enticed to advertise on Angie's List, which, in turn increases the membership base. The Complaint asserts that the repeated statements made by Angie's List and its officers were materially false and misleading because the "slashing" of the membership fee: 1) "compromised the predictability of the revenue derived from its member subscription fees"; and 2) "impaired the PMM's ability to offer service providers a 'qualified' and 'engaged' pool of potential customers—the very asset that the Company routinely touted as the critical feature in securing and maintaining advertising revenues and in differentiating itself from its competitors." *Id*. ¶ 54. The problem is that these allegations, as the Defendants note, are nothing more than unfounded assumptions and speculation which is insufficient under the PSLRA. *See, e.g.*, Defs.' Reply at 7 ("[T]here are no facts alleged explaining how, when, and to what extent that 'relatively predictable revenue stream' . . . was impacted.").

Simply put, the Complaint is devoid of any facts regarding the outcome of the reduction in membership fee. All of the following questions are left unanswered:

- Was the membership base "diluted" by allowing people to become an Angie's List member for only $10?

- Did the revenue Angie's List derived from its member subscription fees decline?

- Did existing members decline to renew their subscriptions because of the lower membership price?

- Was the quality of the reviews lessened because the membership fees were "slashed"?

- Did local service providers decline to renew their contracts (or, decline to enter into a contract) because the membership base was lower-quality?

The Complaint assumes "yes" to all of these; yet, "the PSLRA requires facts supporting beliefs to be pled with particularity . . . [which] is a more stringent standard." *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 944-45 (S.D. Ind. 2005) (dismissing a case "where the allegations . . . are made on information and belief").  Simply put, the Defendants' allegedly misleading statements were only "material" if, as the Plaintiffs assume, the fee slashing resulted in a diluted membership base.  Yet, there are no facts to suggest as much.  This is not to say that the "slashing" had no negative effect.  It may be true that decreasing the membership fee—from, for example $40 to $10—did indeed attract a "lower quality" consumer thus making Angie's List less attractive to advertisers.  Unfortunately for the Plaintiffs, however, there is nothing to support that assumption in the Complaint.

## B. Statements Regarding how Angie's List Oldest Cohorts Typified the PMM's Present Success and Long-Term Sustainability

The same problem lies with the Plaintiffs' second group of allegations.  The Complaint alleges the following:

> The Company's membership revenue stream depended upon, among other things, the Company's ability to transition beyond introductory rates in new markets and to maintain mature pricing points in the Company's oldest cohorts. Despite representing that prices in both the most mature and newer markets were stable and rising, thus serving as an exemplar for the Company's growth potential, during the Class Period, the Company was in fact reverting to introductory rates and/or complimentary memberships in its most established markets in order to artificially grow its paid membership base.

Compl. ¶ 60.  Once again, the Plaintiffs' Complaint is premised on an unfounded assumption: that the key cog in the PMM was the "substantial" or "mature" membership fee.  As the

Defendants note, "no Defendant made or is alleged to have made this representation." Defs.' Reply at 9.

The Complaint essentially equates a lower membership fee with *no* membership fee. This is inaccurate. The characteristic that Angie's List touted as setting it apart from its competitors is the fact that its members *paid*; the PMM, however, is not based on any set fee. Moreover, as the Defendants note, Angie's List achieved membership growth—and membership revenue—"through growing the *number* of new members." *Id*. The emphasis was never placed on the amount of the fee, and the Complaint is devoid of any facts to suggest otherwise. Moreover, the Plaintiffs' allegations are also premised on the assumption that Angie's List's oldest cohort was not doing well, and thus *had* to lower the membership fees to keep pace with competitors (as opposed to, as the Defendants note, simply a desire to conduct a routine price test). However, the *Wall Street Journal* article in no way eludes to this assumption.

In all, the Court finds that the assertions in the Plaintiffs' Complaint are simply too vague and attenuated to withstand the heightened pleading requirements. Lacking the necessary particularity as to the when, where, what, and how the "slashing" of the membership fee *actually* threatened the two core revenue streams or somehow illustrated that the PMM was not working, the Plaintiffs' claims premised on these allegations must be **DISMISSED**.

### C.  Section 20(a)

Section 20(a) of the Exchange Act provides a basis for holding individuals and businesses liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws:

> Every person who, directly or indirectly, controls any person *liable under any provision of this chapter or of any rule or regulation thereunder* shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]

15 U.S.C. § 78t (emphasis added).  As the Defendants note, liability under section 20(a) must be based on an underlying violation of the securities laws or the rules promulgated under them.  Because the Plaintiffs have failed to plead a predicate violation of Section 10(b) or Rule 10b-5, the Section 20(a) claims must be **DISMISSED** under Rule 12(b)(6) for failure to state claim upon which relief can be granted.

## IV.    CONCLUSION

The Plaintiffs have failed to state a claim of securities fraud under section 10(b) of the Exchange Act and Rule 10b-5 of the SEC.  The Plaintiffs' allegations do not meet the heightened pleading requirements of Rule 9(b) or the PSLRA.  Pursuant to Rule 12(b)(6), the Plaintiffs' allegations of control person liability under section 20(a) of the Exchange Act fail to state a claim upon which relief can be granted.  For these reasons, the Defendants' motion to dismiss (Dkt. No. 75) is **GRANTED**.

The Plaintiffs have one additional opportunity to amend their Complaint.  *See Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) ("The better practice is to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the court will be able to determine conclusively on the face of a defective pleading whether plaintiff actually can state a claim.") (quotation marks and citation omitted).   The Plaintiffs may file an amended complaint **within twenty-eight days of the date of this Order**.  If no amended complaint is filed, the Court will enter judgment dismissing the case with prejudice.

SO ORDERED: 6/18/15

*[signature: William T. Lawrence]*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution: Electronically Registered Counsel